# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW DONLEY APSIT, | CV F   04-6323 AWI SMS HC |
| Petitioner, | FINDINGS AND RECOMMENDATIONS REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| | [Doc. 1] |
| K. PROSPER, Warden, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## BACKGROUND

Following a jury trial in the Kern County Superior Court, Petitioner was convicted of two counts of attempted carjacking (California Penal Code sections 664, 215(a)),[1] one count of felony imprisonment (Penal Code § 236), one count of attempted robbery (Penal Code §§ 664, 212.5(a), and one count of vehicle theft (Veh. Code 10851(a)).  (CT 228.)[2]  The jury found true the special allegation that Petitioner had personally used a deadly or dangerous weapon in the commission of each of his offenses except as to one count of attempted carjacking.  (Id.)  In a bifurcated proceeding, the trial court also found true the allegations that Petitioner had suffered a prior

---

[1] All further statutory references are to the California Penal Code unless otherwise indicated.

[2] "CT" refers to Clerk's Transcript on Appeal; "RT" refers to Reporter's Transcript on Appeal; and "SCT" refers to Supplemental Clerk's Transcripts on Appeal.

1

serious felony within the meaning of the three strikes law (Penal Code §§ 667(c)-(j), 1170.12(a)-(e)), a prior serious felony within the meaning of § 667(a), and three prison priors within the meaning of § 667.5(b). Petitioner was sentenced to a term of 22 years and 8 months in state prison.

Petitioner filed a timely notice of appeal to the California Court of Appeal for the Fifth Appellate District. (Lodged Doc. Nos. 1, 2, 3.) On April 14, 2004, the Court of Appeal affirmed Petitioner's conviction and sentence. (Lodged Doc. No. 4.)

Petitioner filed a petition for review with the California Supreme Court, which was denied on November 10, 1999 (Lodged Doc. Nos. 5, 6.)

Petitioner filed the instant petition for writ of habeas corpus on September 15, 2004. Pursuant to the Court's November 18, 2004, order, Respondent filed an answer to the petition on February 23, 2005. Petitioner filed a traverse on March 23, 2005.

## STATEMENT OF FACTS[3]

Seventeen-year-old Terra Padgett testified that on August 29, 2002, she went to a Circle K to purchase gas for her car. She arrived at the gas station at approximately 2:00 o'clock in the afternoon and was pumping gas when [Petitioner] approached her holding a paper cup and asked her for 50 cents to use the telephone. When Padgett leaned into the driver's door and pretended to look for some money, [Petitioner] tried to push her into her car. Padgett also noticed [Petitioner] was holding a wrench in a threatening manner. Scared, Padgett struggled with [Petitioner] and started honking her horn. During the struggle, [Petitioner] said something to the effect of "[d]on't scream, and I won't hurt you" or "[g]et in, and I won't hurt you." Apparently, the noise of the horn startled [Petitioner] and he ran from the scene. Padgett ran into the convenience store and called the police.

David Loomis was working on his truck in his garage a short distance from the Circle K that afternoon when he heard someone walk into his garage. He looked up and saw [Petitioner] standing in his garage by the back wall. [Petitioner], who was holding a wrench at the time, told Loomis to give him his money and his truck. Loomis told [Petitioner] that his truck was not working properly which is why he was working on it. [Petitioner] stated he was "not kidding" and threatened to kill Loomis. Loomis noticed [Petitioner] look away and ran from the garage. He saw a neighbor (whom he did not know at the time) in her car in her driveway, ran up to her, and asked for help. He said he needed a ride and that someone was chasing him, but she declined to help. Loomis saw [Petitioner] coming after him, so he continued running to a nearby pizza parlor where he called the police.

Tiffany Jackson testified that she was pulling her car out of her garage that

---

[3] The Court finds the Court of Appeal correctly summarized the facts in its April 14, 2004, opinion. (Lodged Doc. 4.) Thus, the Court adopts the factual recitations set forth by the California Court of Appeal, Fifth Appellate District.

2

same afternoon when her neighbor (whom she did not know at the time), ran up to her car asking for help.  She told him to calm down and said she could not help him.  He ran away and a few seconds later [Petitioner] ran up to her car.  [Petitioner] said "[g]ive me your fucking car" and attempted to open the rear driver's side door, but could not because it was locked.  Jackson, who was scared, told [Petitioner] to "get the fuck away from my car."  [Petitioner] began to leave, but suddenly turned around, hit the passenger window with something, called her a "son of a bitch" and ran away.  Jackson was afraid when [Petitioner] hit the window because she thought he would break it and get into her car; however, the window did not break.  Jackson called the police after the incident.

     Michael Johnson arrived at his home at approximately 2:10 that afternoon and parked his truck in the driveway.  Leaving his keys inside the truck, he ran inside momentarily to pick up his brother.  While inside he heard his truck start and he ran outside in time to see his truck drive off with one person inside.  Johnson enlisted the help of a friend and followed his truck in another car.  He followed the truck for a distance of five to 10 miles while the driver of his pickup drove erratically through town.  Johnson called the police during the chase and notified them of the truck's route.  The engine of his truck "blew" and the truck came to a stop.  He observed [Petitioner] crawl out of the window of the truck and run away.  After [Petitioner] left the scene, Johnson noticed a wrench in his truck that had not been there earlier.

     Jason Curtis, a friend of Johnson, testified that he accompanied Johnson while they were chasing after his vehicle.  He also identified [Petitioner] as the man who got out of the pickup truck.

     Padgett, Loomis, Jackson, Johnson and Curtis all identified [Petitioner] as the man involved in the crimes during trial.  Bakersfield police officer Brian Kennemer testified that he arrested [Petitioner] at approximately 2:30 that afternoon.  Shortly thereafter, each of the witnesses separately made an in-field identification of [Petitioner].

     Bakersfield police officer Evangelos Demestihas testified that he was assigned to transport [Petitioner] to the police department.  Demestihas performed a pat search of [Petitioner] and found a large crumpled paper cup in his front pocket.  He asked [Petitioner] "What's this for?" and [Petitioner] responded "I took it out of the car with me because I didn't want to leave my fingerprints behind.  I'm smart enough to do that."  Subsequently, while Demestihas was transporting [Petitioner] to the police department, [Petitioner] asked what charges were going to be filed against him.  Demestihas replied that he did not know a lot about [Petitioner's] case, but opined that he could be charged with attempted robbery and attempted carjacking.  [Petitioner] stated, "This shit will never stick.  It never does.  I've been in the penitentiary before.  I know how the game is played."  [Petitioner] further stated, "The only thing I did today was ask some girl for a ride.  And when I got in the car, I asked her if I could have a drink of her Coke.  When I spilled the Coke on her, she got all pissed off at me and asked me to get the fuck out of her car."  He stated that he took the cup with him because he did not want to leave his fingerprints behind.

**Defense Case**

     [Petitioner] testified in his own defense. [Petitioner] stated that on the day in question, he had been working on his truck, which was not running.  He got a ride to the gas station from some girls, so he could make a telephone call.  He had his wrench with him at the time because he had been working on his truck.  He also had a soda with him. [Petitioner] admitted approaching Padgett and asking for 50 cents.  He claimed that he was holding the wrench in his hand because it had been uncomfortable in his pocket.  Padgett leaned into her car pretending to look for money and this angered him.  He pushed Padgett, spilling his soda on both of them, and then got up and ran away.  Padgett yelled when he pushed her and he said something to the effect of "[y]ou ought to shut up before you get

3

> hurt." [Petitioner] denied having any intent to take Padgett's car. He claimed that he ran away because he panicked after pushing her. In addition he said he was concerned because he needed to pick up his daughter after school and he knew there were child molesters in the neighborhood.
>   [Petitioner] admitted to running to Loomis's garage, but denied any intent to rob him. Rather, he asked Loomis for a ride. Loomis replied that his truck was not working, so [Petitioner] asked for some money to use the telephone so he could call his wife to pick up their daughter. [Petitioner] denied threatening Loomis, although he admitted to having a wrench in his possession at the time. Loomis said he would not give [Petitioner] any money and suddenly ran from the garage. [Petitioner] also exited the garage, but ran into the backyard. He turned around and ran out of the garage and down the driveway.
>   [Petitioner] saw Loomis down the street talking to Jackson in a car, so he walked over and asked her for a ride. Jackson seemed scared and told him no and to get away from her car. [Petitioner] walked over to the passenger side of the car, again asked for a ride, and was rebuffed by Jackson a second time. He turned and began walking away, but became frustrated, turned back, hit Jackson's passenger window with the wrench, and called her a "bitch." [Petitioner] denied every trying to open any of Jackson's car doors. In addition, [Petitioner] denied any intent to take her car.
>   [Petitioner] also denied having any involvement in taking Johnson's truck. He claimed that he got a ride from someone after leaving Jackson. He was dropped off at the location where he was arrested.
>   [Petitioner] admitted to making some of the statements to Demestihas but not all of them. He claimed Demestihas had made up the part about him being smart enough to take the cup with him, and that he never said that he could only take one or two more counts of robbery. He stated that, when he made his statements to Demestihas regarding spilling the soda, he was not referring to Padgett; rather, he was referring to some girls who had given him a ride to the gas station. He also stated he made up the statement about a girl being mad at him for spilling the soda. [Petitioner] admitted to making the other statements. [Petitioner] also admitted to being convicted of a felony involving moral turpitude in 1995.
>   Diana Apsit, [Petitioner's] wife, testified that he was supposed to pick up their 12-year-old daughter from school that day at 2:30. Ashley Apsit, [Petitioner's] daughter, also stated that her father was supposed to pick her up from school, as was his usual practice. However, when her father did not arrive, she called her mother to pick her up, which she had done on occasion in the past. [Petitioner's] mother testified that [Petitioner] owned a welding truck at the time of the incident. Diana had the truck moved to her house after [Petitioner] was arrested.

(Opinion, at 2-7.)

## DISCUSSION

A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises

4

out of the Kern County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.      Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are

5

constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction. Brecht v. Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993). In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

C.     Miranda Violation

Petitioner contends that the trial court erred by failing to exclude the statements he made to Officer Demestihas under *Miranda*.

Under Miranda, a person in custody must be informed before interrogation that he has a right to remain silent and to have a lawyer present. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966). Miranda warnings are applicable only to custodial interrogation. See Oregon v. Elstad, 470 U.S. 298, 309 (1985). Interrogation constitutes express questioning by the government or its functional equivalent. Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). In order to constitute interrogation it must be determined whether the police knew or should have known that their words or conduct would likely elicit an incriminating response. Id. Voluntary statements are not subject to Miranda warning, and a statement is voluntary if it is a product of rational intellect and free will. Miranda, 384 U.S. at 478; Innis, 446 U.S. at 301.

The Ninth Circuit recognized, in United States v. Booth, 669 F.2d 1231 (9th Cir. 1981), that "not every question is an interrogation. Many sorts of questions do not, by their very nature, involve the psychological intimidation that Miranda is designed to prevent." United States v. Booth, 669 F.2d 1231, 1237 (9th Cir. 1981). For example, asking a defendant his name, birth date, address and the like ordinarily does not constitute interrogation; police officers typically have no reason to believe a suspect will incriminate himself by answering such questions. See, e.g., Pennsylvania v. Muniz, 496 U.S. 582, 598-600 (1990); see also United States v. Perez, 776

6

F.2d 797, 799 (9th Cir. 1985) (routine gathering of background biographical data does not constitute interrogation sufficient to trigger constitutional protections). However, when an officer has reason to know that a suspect's answer may incriminate him, even routine questioning may amount to interrogation. See Innis, 446 U.S. at 301.

As Respondent correctly submits, prior to trial, Petitioner moved to suppress his statements made to Officer Demestihas arguing that they were obtained in violation of his Miranda rights. The trial court held a hearing pursuant to California Evidence Code § 402, and Officer Demestihas testified as to the circumstances surrounding the statements made by Petitioner. (See RT 18-37.) The Court of Appeal correctly summarized the facts presented at the hearing as follows:[4]

> [Officer] Demestihas testified that he was assigned to detain [Petitioner] and transport him to the police station. He performed a patdown search of [Petitioner] and recovered a large crumpled paper cup from his front pocket. Prompted by curiosity, Demestihas asked [Petitioner]: "What's this for?" [Petitioner] replied that he took it out of the car with him because he did not want to leave his fingerprints behind, stating "I'm smart enough to do that."
> While transporting [Petitioner] to the police station, [Petitioner] asked Demestihas what charges could be filed against him. Demestihas replied that he could be charged with attempted carjacking and attempted robbery, but he was not sure because he did not know the facts of the case. Demestihas admitted to listening to the police radio during the incident, but denied knowing anything about [Petitioner's] case. [Petitioner] told Demestihas that he had a "friend" with him during the incident and also stated that "[t]his shit will never stick. I've been in the penitentiary before. I know how it works." [Petitioner] also stated during the ride that his friend had gotten away, and that he had almost escaped as well. When asked what his friend's name was, [Petitioner] responded he did not know.
> He continued, stating: "The only thing I did today was ask for a ride." He went on explaining: "After I spilled the Coke, she asked me to get out of the car, and I did." Additionally, [Petitioner] asked Demestihas if he had it within his power to drop some of the charges. When Demestihas replied that he could not, [Petitioner] stated he had just recently been released from prison that that [sic] he could not take more than one or two felonies against him. He said he had been "doing good" until that day, and he did not know what happened. Demestihas admitted he never gave [Petitioner] any *Miranda* warnings.
> Further, questioning revealed that Demestihas had told [Petitioner] "If there was another person who's responsible for these things, we need to know about that" prior to leaving the scene. He also stated he asked [Petitioner] if Julie Apsit was related to him; however, that was unrelated to the case.

(Opinion, at 7-8.)

The objectionable statements can be broken down into three groups: the first statement is

---

[4] These facts are entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1).

7

that Petitioner took the plastic cup because he was smart enough not to leave any fingerprints behind (RT 196); the second statement is "this shit will never stick. I've been in the penitentiary before. I know how it works" (RT 197); and, the third and last statement dealt with whether another individual was involved in the crime.[5]

The trial court ruled that although Petitioner was in custody at the time he made the statements, his statement regarding the plastic cup was not the product of interrogation and was therefore admissible. The trial court reasoned that Officer Demestihas's only function in the case was to transport Petitioner and that his question regarding the paper cup was prompted solely by curosity.[6] (RT 42.) Further, the trial court found that Petitioner's remaining statements were volunteered and were not the result of questioning or other statements from the officer. (RT 42-43.) The trial court did find, however, that Officer Demestihas's statements regarding another perpetrator were designed to gather information and excluded Petitioner's statements regarding the second person. (RT 43-46.)

In rejecting Petitioner's claim on direct appeal, the Court of Appeal held:[7]

> Demestihas's question was not one he should have known was reasonably likely to elicit an incriminating response. When Demestihas searched [Petitioner] he found a large crumpled paper cup in [Petitioner's] front pocket. Confronted with this unusual situation, Demestihas asked [Petitioner], "What's this for?" Demestihas testified that he did not know of the facts surrounding [Petitioner's] crime, although he admitted to monitoring the police radio around the time [Petitioner] committed his crime. The trial court concluded Demestihas did not know that the paper cup had played a role in the commission of the crimes, and this conclusion is supported by the evidence. The officer's question, under the circumstances of this case, was not one that was designed to elicit an incriminating response. Indeed, one would not expect that a paper cup would have anything to do with a carjacking charge. Thus, we conclude the trial court's ruling was proper.

---

[5] As stated below, the third statement was excluded under Miranda.

[6] In reaching this conclusion, the trial court accepted Officer Demestihas's assertion that he did not know about the facts of the case or that the cup played a role in the crimes. (RT 42.)

[7] Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under § 2254(d)(1)).

8

(Opinion, at 10.)

The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. As the Court of Appeal determined, Officer Demestihas's question "what's this for" in response to discovering a crumpled cup inside Petitioner's front pocket was not reasonably likely to elicit an incriminating response. As the state court found, Officer Demestihas had no reason to believe that a crumpled paper cup would play any role in Petitioner's crimes. (Opinion, at 10.) Rather, as Respondent submits, Officer Demestihas likely believed, pursuant to arresting and booking Petitioner - which would involve processing and cataloguing Petitioner's belongings - that he had to determine whether the cup had any value to Petitioner and, accordingly, whether it should be retained. Further, as Respondent submits, it is not reasonable to expect that Officer Demestihas could have foreseen that the simple question of "what's this for" would elicit an incriminating response that Petitioner was "smart enough" not to leave fingerprints behind. Because the state courts' finding that Petitioner was not subjected to interrogation at the time he made the incriminating statement regarding the plastic cup, and his later choice to volunteer further information to Officer Demestihas did not run afoul of Miranda, is not contrary to, or an unreasonable application of, Supreme Court authority, Petitioner's claim must be denied. See Beaty v. Steward, 303 F.3d 975, 991 (9th Cir. 2002) (spontaneous statement did not result from interrogation, and therefore did not violate Miranda); Jackson v. Calderon, 211 F.3d 1148, 1155 (9th Cir. 2000) (spontaneous statement is not excludable under Miranda). In any event, for the reasons explained infra under section D, any error would have been harmless because of the overwhelming independent evidence of Petitioner's guilt.

Petitioner's contention in his traverse that Officer Demestihas initially responded to the scene of the crime prior to going to the location where Petitioner was being detained to transport him to the jail, and he therefore learned information regarding the importance of the plastic cup, resulting in improper interrogation, is speculative and conclusory and not supported by the record in this case. Although it appears that Officer Demestihas was initially dispatched to respond to the scene of Harris and Stine, he was subsequently dispatched to 7900 White Lane to transport

1  Petitioner.  (See RT 191-192, 203.)  There is no evidence to support Petitioner's conclusory and
2  self-serving contention that he had any information regarding the role that a plastic cup may have
3  played in the crime.  Officer Demestihas testified unequivocally that the only information that he
4  learned of the crime came from listening to the police radio,  and there is no evidence that any of
5  the information contained a report regarding a plastic cup being involved in the crime.
6  Accordingly, a review of the record shows that Petitioner fails to present clear and convincing
7  evidence to rebut the presumption of correctness that this Court's affords the state courts' factual
8  findings.  See 28 U.S.C. § 2254(e)(1).  In sum, the state courts' determination is not based on an
9  unreasonable determination of the facts, 28 U.S.C. § 2254(d)(2), or contrary to federal law, 28
10  U.S.C. § 2254(d)(1).

11  D.     Admission of Statements Due Process Violation

12      Petitioner contends that the trial court erred by failing to exclude his statements that he
13  had previously been incarcerated in prison as unduly prejudicial pursuant to California Evidence
14  Code section 352.[8]

15      Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a
16  federal habeas corpus proceeding. Estelle, 112 S.Ct. at 477; Middleton v. Cupp, 768 F.2d 1083,
17  1085 (9th Cir.), *cert. denied,* 478 U.S. 1021 (1985).  Nevertheless, there can be habeas relief for
18  the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a
19  denial of due process. Estelle, 112 S.Ct. at 482; Pulley v. Harris, 465 U.S. 37, 41, 104 S.Ct. 871,
20  874 (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d
21  1180, 1192 (9th Cir. 1993), *cert. denied*, 510 U.S. 1191, 114 S.Ct. 1294 (1994); Gordon v. Duran,
22  895 F.2d 610, 613 (9th Cir.1990).  However, the failure to comply with state rules of evidence
23  alone is neither a necessary nor a sufficient basis for granting federal habeas relief on due process
24  grounds. Jammal v. Van de Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991).  Only if there are no
25  permissible inferences that the jury may draw from the evidence can its admission rise to the

---

[8] California Evidence Code section 352 provides:

The court in its discretion may exclude evidence if its probative value is substantially outweighed
by the probability that its admission will (a) necessitate undue consumption of time or (b) create
substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

10

level of a due process violation. Id. at 920. Even if Petitioner can demonstrate constitutional error, he must also show that the error was not harmless under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). To do so, the petitioner must show that the evidentiary ruling had "'a substantial and injurious effect' on the verdict." Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001).

During the California Evidence Code § 352 hearing, Officer Demestihas testified in relevant part:

> Q. And during the course of you - - your travels from that location, where you placed him in the vehicle, to the Bakersfield City Police Department, did you ask him any questions?
> A. No, I didn't.
> Q. Did you attempt to interview him?
> A. No, I didn't.
> Q. Did he say - - make any statement?
> A. Yes, he did.
> Q. What type of statements did he say?
> A. May I refer to my report?
> Q. Sure.
> A. [Petitioner] asked me what were some of the possible charges against him.
> Q. And did you reply as to what the charges might be?
> A. Yes, I did.
> Q. And what type of charges did you reply?
> A. I told him attempt carjacking, maybe attempt robbery. I wasn't quite sure.
> Q. And at this time, you didn't know any of the facts of the case?
> A. No, I did not.
> Q. And once - - once you told him what the possible charges might be, what was his response or what was his statement?
> A. He said that he wasn't by himself. His friend was with him.
> Q. What else did he say?
> A. He went on to say - - may I refer to my report?
> Q. (Nods head.)
> A. He said, quote, "This shit will never stick. I've been in the penitentiary before. I know how it works."
> Q. Did he - - did you - - when he started saying this, did you start asking him any questions whatsoever?
> A. No, I didn't.

(RT 24-26.)

In rejecting Petitioner's motion to exclude the statement under § 352, the trial court stated:

> Tentatively, I'm inclined to deny that with the exception of deleting the one word "robbery." Everything else he said. And I think that he said it, he volunteered it, it's in context, it's in part exculpatory. Talking about four years he's been clean, he's been forthright about who he is and what he's done, and sure it's prejudicial.

11

>       On the other hand, he's the one who said it. It's not like impeaching him with his priors. The only thing that I'm concerned about when it comes to a balancing act is the robbery. It being a robbery.
>       And I think that with everything else being left in, the probative value of the jury finding out exactly what it was is minimal compared to the fairly obvious potential prejudice.

(RT 52.)

In rejecting Petitioner's claim on direct appeal, the Court of Appeal held:

>       Even if we were to assume that [Petitioner's] statements about previously being incarcerated should have been excluded, we would find the error harmless. . . .
>       The evidence of [Petitioner's] guilt was overwhelming. Jackson testified that [Petitioner] ran up to her car, said "Give me your fucking car" and attempted to open one of the doors, but was unable to do so because it was locked. [Petitioner] began to run away, but suddenly turned around, hit the passenger window with a wrench and then ran away. [Petitioner] admitted that he approached Jackson's car, but he denied trying to open any of the car doors. Rather, he claimed that he asked Jackson for a ride, and when she said no he started to walk away, but turned around and hit the window with the wrench because he was frustrated. The testimony provided ample evidence that [Petitioner] attempted to carjack Jackson initially when he tried to open one of her car doors.
>       Furthermore, other evidence demonstrated [Petitioner] possessed the intent to take a vehicle. Padgett testified [Petitioner] approached her, asked for money, and then pushed her into her car, in an apparent effort to take her vehicle. After she scared [Petitioner] away by honking the horn, [Petitioner] ran to Loomis's house where he entered the garage and demanded his vehicle. Subsequently, he approached Jackson, who testified that [Petitioner] demanded her car and attempted to get into the vehicle. Finally, Johnson testified that [Petitioner] took his truck, which was parked in his driveway, without his permission. [Petitioner's] numerous attempts to secure a vehicle, and his ultimate success in taking a vehicle from a fourth victim, provided overwhelming evidence of his intent to take a vehicle from Jackson.
>       The fact that the jury ultimately found that [Petitioner] did not use the wrench in the commission of the carjacking was in no way inconsistent with the evidence. Rather it demonstrated that the jury closely evaluated the evidence and determined, as [Petitioner] argued at trial, that [Petitioner's] use of the wrench was an afterthought and was intended to vandalize Jackson's car, rather than a second attempt to get into the vehicle. That the jury believed [Petitioner's] assertion that he hit the car window out of frustration, rather than an attempt to break into the vehicle, demonstrates that the jury did not blindly convict [Petitioner] on all counts because he had previously been in prison. Thus, in light of the great strength of the evidence relating to [Petitioner's] guilt, any error in admitting [Petitioner's] statements was harmless.

(Opinion, at 11-12.)

The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Initially, as Respondent submits, the admission of Petitioner's statement that "this shit will never stick. I've been in the

penitentiary before. I know how it works," was not so arbitrary or prejudicial that it rendered the trial fundamentally unfair. The evidence was relevant to Petitioner's guilt because a reasonable inference could be drawn that Petitioner knew he was guilty, and was therefore probative evidence of consciousness of guilt. Petitioner never challenged the reliability of the statements, and it was therefore uncontested. (See RT 18-37.) Further, the evidence was not cumulative. It was not duplicative evidence that could have been excluded without hampering the State's case. Finally, the evidence did not present any great danger of unfair prejudice to Petitioner.

Moreover, for the reasons explained by the Court of Appeal, even if the trial court's ruling in admitting Petitioner's statement was in error, there was no resulting prejudice. As such, Petitioner cannot demonstrate relief by way of section 2254.

E.   Trial Court Error and Ineffective Assistance of Counsel

Petitioner contends that the trial court erred in failing to provide the jury with a written copy of the jury instructions, as required by section 1093(f).[9] Petitioner further contends that his counsel was ineffective for failing to object to the trial court's error.

As stated by the Court of Appeal, "[a]fter instructing the jury the trial court informed the jurors that it would not be providing them with a written copy of the instructions, as was its normal practice, because the computer system had failed. The court further informed the jurors that no written copy of the instructions would be available during deliberations; however, the court did tell the jury that 'if during your deliberations you have a question or a concern as to any of these legal principles, all you need to do is send me a note. I'll bring you out, and I'll share it with you at that particular point in time.'" (Opinion, at 13.)

The state court found and Respondent concedes that the trial court erred when it failed to comply with the requirements of section 1093(f). Initially, the Court notes that there is no constitutional right for the jury to be provided with a written copy of the jury instructions prior to

---

[9] Penal Code section 1093(f) provides in pertinent part:

Upon the jury retiring for deliberation, the court shall advise the jury of the availability of a written copy of the jury instructions. The court may, at its discretion, provide the jury with a copy of the written instructions given. However, if the jury requests the court to supply a copy of the written instructions, the court shall supply the jury with a copy.

13

or during deliberation. As such, it is questionable whether the instant claim is cognizable pursuant to section 2254. 28 U.S.C. § 2254. However, to the extent Petitioner argues that the instant claim raises a due process challenge, it fails on the merits. Federal habeas review is limited to a determination of whether the alleged error of state law "so infected the trial with unfairness as to deny due process of law". Estelle v. McGuire, 502 U.S. 62, 72, 112 S.Ct. 475, 482 (1991).

As the Court of Appeal properly found, although the trial court incorrectly informed the jury that the copy of the written instructions would not be available, the court appropriately informed the jury that if there were any questions regarding the instructions it could send the court a note, and the court would re-read the instructions accordingly. Prior to rendering a verdict in this case, the jury never expressed any confusion regarding the jury instructions nor did it request read-back of any instructions. In fact, had the jury so requested, the trial court's advisement adequately indicated that the instructions would have been re-read to them. Furthermore, the jury's short deliberations of only 90 minutes supports the conclusion that the jury understood the instructions and had no problem rendering its verdict.

Petitioner's claim that the jury was confused as to the instructions because it rendered guilty verdicts on both the greater and lesser offenses in Count 4, was properly rejected by the Court of Appeal which stated:

> That the jury returned an additional verdict does not demonstrate that the jury would have come to a more favorable conclusion had the jury been provided with the written jury instructions. The jury concluded, beyond a reasonable doubt, that [Petitioner] committed the charged offense. The jury was instructed orally with CALJIC No. 17.10, which informed the jurors that the court could not accept a guilty verdict on the lesser crime unless the jury first returned a not guilty verdict on the charged offense. Here the jury found [Petitioner] guilty of the greater and lesser charges. Had the jury been provided with the written instruction, it is not reasonably probable that the jury would have discarded its guilty verdict on the charged offense in favor of a guilty verdict on the lesser charge. Thus, the error was not prejudicial.

(Opinion, at 14.)

Because Petitioner has failed to demonstrate any resulting prejudice, Petitioner's related claim that counsel was ineffective for failing to object, fails. See Shah v. United States, 878 F.2d 1156, 1162 (9th Cir. 1989) (counsel's failure to raise meritless legal argument does not constitute

14

ineffective assistance of counsel).

F.      Instructional Error

Petitioner contends that the trial court failed to properly instruct the jury as to how they were to decide between lesser and greater offenses. More specifically, Petitioner contends that the jury should have been instructed pursuant to People v. Dewberry, 51 Cal.2d 548, 555 (1950), which held that "when the evidence is sufficient to support a finding of guilt of both the offense charged and a lesser included offense, the jury must be instructed that if they entertain a reasonable doubt as to which offense has been committed, they must find the defendant guilty only of the lesser offense."

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in a federal habeas corpus action. See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See id. at 72. Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id. The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. See United States v. Frady, 456 U.S. 152, 169 (1982) (*citing* Henderson v. Kibbe, 431 U.S. 145, 154 (1977)). Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710 (1993) (whether the error had a substantial and injurious effect or influence in determining the jury's verdict.). See Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996). The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Id.

In this case, the trial court instructed the jury with CALJIC No. 17.10 as follows: "If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the crime charged in

Counts 1 through 4, you may nevertheless convict him of any lesser crime if you are convinced beyond a reasonable doubt that the defendant is guilty of the lesser crime." (CT 177; RT 306-307.)

In rejecting Petitioner's claim on direct appeal, the Court of Appeal held, in relevant part:

> We recognize there may be a distinction between informing jurors they must give the defendant the benefit of any reasonable doubt as to the nature of the offense, and advising them that if they have a doubt the defendant committed the greater offense, they may return a verdict on the lesser. Nevertheless, CALJIC No. 17.10 conveys the essential principle the jury must choose the lesser offense if it entertains a reasonable doubt as to the greater crime. The instruction correctly informed the jurors they should not convict defendant of the crimes charged if they harbored a reasonable doubt as to any element of those crimes. Moreover, in addition to reading CALJIC No. 17.10, the jury was also given the standard instruction on reasonable doubt (CALJIC No. 2.90). Read together, those instructions clearly told the jury that the People bear the burden of proving guilt beyond a reasonable doubt. (Footnote omitted.)

(Opinion, at 16.)

After the jury reached a verdict in the case, and the trial court was reviewing the verdict forms, it became apparent that the jury had returned guilty verdicts in Count 4 of both the greater and lesser included offenses. (See RT 396-397.) In rejecting Petitioner's claim that the trial court should have given a Dewberry instruction when the jury returned verdicts on both the charged and lesser offenses on count 4, the Court of Appeal stated:

> When the jury returned its verdicts, the trial court noticed the jury had completed the verdict forms for both the charged and lesser offenses on count 4. The trial court informed the jury that it could only return one verdict, and inquired of the jury whether their verdict was accurately reflected in its finding of guilt on the charged offense. Specifically, the trial court asked the jurors whether they had decided that [Petitioner] had attempted to rob the victim inside of the garage. The foreman replied that the jurors had come to that conclusion. In addition, the court asked if the jury had also concluded [Petitioner] attempted to steal the vehicle while in the garage. The foreman again agreed that is what the jury had done. The court concluded the jury had made an error in returning both verdicts and struck the verdict on the lesser offense. The court then polled the jury asking each juror whether their verdict was guilty of the charged crime on count 4. Each juror responded in the affirmative.

(Opinion, at 17.) (RT 396-402.)

As Respondent correctly submits, the state court appropriately noted that the trial court asked the jury whether it had found the elements of the charged offense in Count 4 (attempted robbery) beyond a reasonable doubt. Contrary to Petitioner's assertion, there is simply no evidence that the jury harbored any doubt as to which offense Petitioner committed or that the

16

evidence established that he committed the attempted robbery beyond a reasonable doubt.  A fact of which each juror affirmatively agreed.  (See RT 401.)  As Respondent points out, the jury believed Petitioner committed both offenses which is a logical conclusion given that the lesser offense is included in the greater offense.  There was no ambiguity in the jury's finding other than the superfluous error in finding Petitioner guilty of both the greater and lesser offenses.  The trial court properly struck the jury's finding on the lesser included offense and no error occurred.  In sum, there is no reasonable likelihood that the jury applied CALJIC 17.10 in an unconstitutional manner and the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

G.  Cumulative Prejudice

Petitioner contends that the cumulative effect of the trial court's errors caused him prejudice.

Cumulative error applies where, "although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant."  United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996); Killian v. Poole, 282 F.3d 1204, 1211 (9th Cir. 2002).

No cumulative error occurred in this case.  Although for the reasons explained above, the trial court erred in failing to make available for the jury a copy of the jury instructions, this single error resulted in no prejudice to Petitioner.  Therefore, Petitioner's claim fails.

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The instant petition for writ of habeas corpus be DENIED; and

2. The Clerk of Court be directed to enter judgment in favor of Respondent.

These Findings and Recommendations are submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   September 8, 2006**            /s/ Sandra M. Snyder
icido3                                              UNITED STATES MAGISTRATE JUDGE